## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICHARD BILIK,

            Plaintiff,

v.

DR. ROBERT SHEARING,
MICHAEL MODENHAUER,
JOHN TROST, RICHARD
HARRINGTON, SALVADOR
GODINEZ, BILLIE W. GREER,
ANGELA GROTT, JACQUELINE
LASHBROOK, RICHARD FERRELL,
CINDY MCDANIELS, GAIL WALLS,
ANGELA CRAIN, KIMBERLY BUTLER,
FE FUENTES, JOHN BALDWIN,
STEPHEN RITZ, SHARON MCGLORN,
and JOHN AND JANE DOES,[1]

            Defendants.

Case No. 3:16-CV-821-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is the Report and Recommendation of Magistrate Judge Gilbert C. Sison (Doc. 190), in which he recommends the undersigned grant the motions for summary judgment filed by Defendants (Docs. 106, 109, 129). Plaintiff Richard Bilik filed a timely objection to the Report and Recommendation (Doc. 198). For the reasons set forth below, the Court adopts the recommendation of Judge Sison and grants Defendants' motions.

---

[1] As noted by Magistrate Judge Sison, Bilik failed to identify the John and Jane Doe Defendants by the deadline set in the Trial Practice Schedule (Doc. 48). Accordingly, the John and Jane Doe Defendants are hereby **DISMISSED without prejudice**.

Plaintiff Richard Bilik is an inmate in the Illinois Department of Corrections. Prior to his incarceration, Bilik experienced headaches and debilitating migraines a few times a week, which he attributes to head trauma from practicing Taekwondo when he was younger and two car accidents where he went through the windshield (Doc. 110-1 at pp. 23-24). Bilik would take eight or ten Motrin to help with the pain (*Id.* at p. 24).

Bilik was incarcerated for a period of time prior to 2009, during which a doctor prescribed Tramadol for his migraines (*Id.*). Bilik testified that Tramadol, a narcotic opioid pain reliever, was effective in alleviating his migraine pain (*Id.*). In 2012, Bilik claims he was assaulted in the Cook County Jail, which caused a traumatic brain injury and nerve damage (*Id.* at p. 25). Bilik was prescribed ibuprofen, Tramadol, and Neurontin (gabapentin) for his pain (*Id.*). Neurontin is an anticonvulsant drug also used off-label for various conditions including the treatment of neuropathic pain (Doc. 107-2 at p. 2).

Bilik again entered the IDOC on October 5, 2012, and was placed in Lawrence Correctional Center on October 19, 2012. On June 12, 2013, Bilik had a physical therapy evaluation for his lower back pain.

Bilik was transferred to Menard Correctional Center on June 14, 2013 (Doc. 130-1 at p. 15). Upon arriving at Menard, Bilik completed an intake medical screening, including an evaluation with a registered nurse (Doc. 107-1 at p. 1). The nurse noted Bilik's chronic conditions included panic/anxiety disorder, neuropathic pain, migraines, high cholesterol, and allergies (*Id.*). She also noted he was on a number of medications for those conditions, including Claritin, Neurontin, Naproxen, Effexor, Depakote, Celexa,

and Lipid Omega-3 Fatty Acid (*Id.*). During this evaluation, Bilik reported complaints of left leg pain, but did not appear to be in any distress (*Id.*). The nurse scheduled Bilik for a routine follow up with sick call (*Id.*).

Defendant Dr. Robert Shearing, the medical director at Menard from October 15, 2012, through November 16, 2013, performed Bilik's intake medical screening via telephone and renewed Bilik's prescriptions for Omega-3 Fatty Acid, Effexor, Depakote, and Celexa. He also referred Bilik to a mental health practitioner for further evaluation and to address his psychiatric prescription needs. Dr. Shearing discontinued the Claritin, Neurontin, and Naproxen pending further evaluation by a physician or nurse practitioner and ordered Bilik scheduled on the MD sick call line (*Id.* at p. 2; Doc. 107-2).

Dr. Shearing explained via affidavit that, when an inmate arrives at a new correctional facility, medications prescribed at prior correctional centers are not automatically renewed or continued (Doc. 107-2). This is because certain medications are known for abuse in the correctional context; thus, they are only re-prescribed after the medical director, physician, or nurse practitioner has evaluated the transferring inmate (*Id.*). This would include Neurontin, which has a highly adverse side effect profile, including sedative and hypnotic qualities (*Id.*). This procedure also ensures the medication and dosage remain appropriate for the patient and that it is not being abused or misused (*Id.*). Inmates also are instructed that the sick call process is available to them if they feel they need medications other than those prescribed for them and that over-the-counter pain medications are available at commissary (*Id.*).

On June 21, 2013, Bilik went to Nurse Sick Call, where he was evaluated for complaints of right arm and shoulder pain (Doc. 107-1 at p. 3). Bilik received a prescription for acetaminophen and was referred for further evaluation with a medical doctor (*Id.*).

On June 27, 2013, Bilik was evaluated by Mental Health and received prescriptions for Effexor, Celexa, and Buspar, which is an anti-anxiety medication (Doc. 107-1 at p. 4). Bilik reported receiving Depakote for complaints of migraine headaches and was instructed this prescription would be issued by Medical Department at Menard, if necessary (*Id.*; Doc. 107-2).

Bilik was scheduled to see a doctor on June 28, 2013, but he was not examined due to lack of time (Doc. 107-2). He was rescheduled for July 3, 2013, but security did not bring him to the Health Care Unit for his appointment (*Id.*). Bilik finally was examined by Dr. Shearing on July 15, 2013 (Doc. 107-2). Bilik complained about back, neck, arm, and leg pain, which he attributed to the assault by police in 2012 (*Id.*). He also complained of migraine headaches every day with nausea, light sensitivity, and sound sensitivity, and demanded various medications to address his complaints (*Id.*). Dr. Shearing attested that he performed various physical tests that could have indicated causes for Bilik's reported pain, but all tests were negative or came back within normal limits (*Id.*). Dr. Shearing's assessment was that Bilik was magnifying his symptoms and exhibiting drug-seeking behavior (*Id.*). He informed Bilik that if he truly had daily headaches, long-term overuse of analgesics was making the problem worse rather than better (*Id.*). Dr. Shearing attested that the use of pain medication over long periods of time can trigger rebound headaches

in increasing severity over time; however, the headaches can be eliminated when a patient stops taking the regularly used medication (*Id.*).

Based on Dr. Shearing's evaluation, he reduced Bilik's analgesic regimen to a total of 500 mg Naproxen to address all of his self-reported ailments (*Id.*). He also discontinued Bilik's prescriptions for Neurontin and Depakote, as he found them unnecessary to treat Bilik's subjective complaints and believed they were causing Bilik to suffer more frequent rebound headaches (*Id.*). He did renew Bilik's Claritin prescription (*Id.*).

On August 27, 2013, Bilik saw Defendant Dr. Fe Fuentes for allergy-related complaints (*Id.*). She prescribed him a nasal decongestant spray (*Id.*). Fe Fuentes was a physician at Menard Correctional Center between June 2, 2008 and July 17, 2015.

On September 25, 2013, Bilik was evaluated by a medical technician and requested a renewal of his nasal decongestant spray and Claritin prescriptions (*Id.*). He also requested a renewal of his Naproxen prescription for back pain (*Id.*). The technician referred Bilik for an evaluation with a medical doctor (*Id.*).

Dr. Shearing saw Bilik on September 30, 2013, at which point Bilik complained of chronic nasal congestion, back pain, and neck pain (*Id.*). Dr. Shearing noted that Bilik's physical exam and x-rays were normal (*Id.*). Dr. Shearing discontinued Bilik's prescription for the nasal spray and issued new prescriptions for Mobic, a non-steroidal anti-inflammatory drug used to treat swelling and pain, as well as Claritin (*Id.*). He also directed Bilik to return in three weeks for another evaluation (*Id.*).

Less than two weeks later, Bilik presented at Nurse Sick Call where he was evaluated by a medical technician for back pain (*Id.*). The medical technician referred

Bilik for an evaluation with a medical doctor or nurse practitioner (*Id.*).

On October 18, 2013, Bilik was examined by Defendant Michael Moldenhauer, a registered nurse practitioner who has worked at Menard since January 15, 2013. Bilik complained of pain in his upper, mid, and lower back, as well as right arm pain (*Id.*). Moldenhauer referred Bilik to Dr. Shearing for further evaluation (*Id.*).

On November 4, 2013, Bilik saw Dr. Shearing, reported back pain, and demanded a prescription for Tramadol (*Id.*). Dr. Shearing again noted that Bilik's exams and tests were normal and that Bilik exhibited clear drug-seeking behavior (*Id.*). Dr. Shearing did not prescribe Tramadol, but rather recommended that Bilik continue his current treatment plan and follow up as necessary (*Id.*). That was the last time Dr. Shearing evaluated Bilik (*Id.*).

On December 23, 2013, Bilik saw a medical technician in the Health Care Unit and complained that his back always hurt and the Mobic was not working (Doc. 12-2 at p. 82). He also complained about his headaches and told the nurse that he previously took Neurontin, Depakote, and Tramadol, which were effective at treating the pain (*Id.* at pp. 82-83). The medical technician referred Bilik to the doctor, prescribed ibuprofen 200 mg, and told Bilik to begin gentle strengthening exercises (*Id.*)

Defendant Dr. John Trost, who became the Medical Director of Menard on November 25, 2013, saw Bilik on January 10, 2014, for renewal of lipid medication and complaints of back pain (Doc. 110-2). Dr. Trost prescribed Naproxen and Elavil, a tricyclic antidepressant which can also effectively relieve nerve pain (*Id.*). He ordered a lipid panel, thyroid test, Naproxen 500 milligrams twice a day for three months, and Elavil 10

milligrams daily (*Id.*). He also evaluated Bilik for his request of low bunk and low gallery permits, but determined they were not necessary at that time (*Id.*).

On April 8, 2014, Dr. Trost again saw Bilik for complaints of low back pain (*Id.*). Dr. Trost observed Bilik had a steady gait and diagnosed chronic low back pain (*Id.*). He prescribed Naproxen 500 milligrams twice a day for three months (*Id.*).

On August 14, 2014, Bilik saw a nurse in the Health Care Unit and requested a "renewal" of his prescriptions for Naproxen, Depakote, Elavil, Tramadol, and Neurontin (*Id.*; Doc. 12-2 at p. 92). The nurse referred Bilik to see a physician (*Id.*). On August 20, 2014, Dr. Trost ordered Naproxen and Nortriptyline 25 milligrams, a tricyclic antidepressant that can also effectively relieve nerve pain (*Id.*; Doc. 12-2 at p. 93). Dr. Trost attested that his plan at that time was to defer the renewal of Depakote to the mental health provider (*Id.*).

On September 5, 2014, Bilik received a letter from Mrs. McElvain in the Mental Health Unit enclosing chronic pain control techniques and visualization strategies (Doc. 12-2 at pp. 72-75). The letter encouraged Bilik to pick one of the strategies and practice a minimum of 30 minutes a day, three times a week (*Id.*).

On October 25, 2014, Bilik saw a nurse in the Health Care Unit and complained of severe constant pain in his entire back (Doc. 110-3 at p. 49). He reported having taken Naproxen, Neurontin, and Tramadol in the past, which were effective for the pain (*Id.*). He also reported numbness in his right arm (*Id.*). Bilik was referred to the physician for the prescription of Elavil because he said he was not receiving it (*Id.*). He also was prescribed acetaminophen (*Id.*).

Bilik next saw Moldenhauer on November 4, 2014, for complaints of back pain and neuropathy (*Id.* at p. 53). Moldenhauer noted Bilik ambulated with a slow and guarded gait but had no difficulty removing his socks and shoes (*Id.*). Upon examination, Bilik had good sensation in both lower extremities but poor sensation on his right arm/hand (*Id.*). Moldenhauer offered Bilik Motrin instead of Naproxen, but Bilik declined (*Id.*). Moldenhauer testified that on the occasions he was involved with Bilik's care, he did not deem physical therapy to be appropriate or medically necessary (Doc. 198-2 at p. 8). If he had, Moldenhauer stated, he would have referred Bilik to the physician for further consideration of those treatments (*Id.*).

On November 25, 2014, Bilik saw a medical technician and complained that his pain medication was not strong enough to combat his pain (*Id.* at p. 58). The following day, he saw another nurse and again complained about his pain medicine not working (*Id.*). He also stated that he had a cyst on his scalp (*Id.*).

On December 22, 2014, Bilik saw a nurse in the Health Care Unit for muscle strain and joint pain (*Id.* at pp. 60-62). He complained of pain in his knees from falling off his bunk in 2012, noting a constant, dull pain precipitated by weather and heat (*Id.*). He also complained of back pain, stating that his entire back and spine hurt and rating the pain ten out of ten (*Id.*). Bilik reported taking Naproxen, Buspar, Celexa, and Elavil in the past (*Id.*). He was also seen for his headaches and referred to the physician (*Id.*).

On December 30, 2014, Bilik saw Dr. Fe Fuentes and complained of back and knee pain (Doc. 110-8). Dr. Fuentes noted that his gait was steady and diagnosed degenerative joint disease of the thoracic and lumbar spines (*Id.*). Dr. Fuentes ordered x-rays of the

thoracic and lumbar spines, Naproxen 500 mg, Mobic 25 mg, and low bunk and low gallery permits with no work for one year (*Id.*). The x-rays revealed no compression fracture or subluxation in the lumbar or thoracic spine, but showed minor early degenerative changes at LS-S1 level (*Id.*). Dr. Fuentes attested that she did not prescribe Neurontin or physical therapy because neither treatment was clinically indicated based on Bilik's complaints and her exam findings (*Id.*).

On January 22, 2015, Dr. Trost increased Bilik's dose of Nortriptyline from 25 mg to 50 mg for Bilik's complaints of pain and renewed his Mobic prescription (Doc. 110-2).

On March 29, 2015, Bilik saw a nurse and requested the results of his back x-ray. Bilik explained that the Mobic was not helping and that the pain was worse when standing and in bad weather (Doc. 110-3 at p. 65). The nurse suggested using a warm pack on his lower back at night. She also reviewed the results of the x-ray with him and instructed him to follow up if there was no improvement (*Id.*).

Dr. Trost next saw Bilik on August 7, 2015, for complaints of back pain (Doc. 110-2). Bilik claimed to receive no benefit from the Mobic or Nortriptyline (*Id.*). He also complained of cervical pain that radiated to his left arm (*Id.*). Dr. Trost made a note to discuss the merits of x-rays of Bilik's c-spine and MRI of the lumbar spine in collegial review, prescribed Tylenol 500 milligrams, Mobic 7.5 milligrams, and increased the Nortriptyline dosage to 100 milligrams (*Id.*). Later that day, Dr. Trost completed a Medical Special Services Referral and Report in order to schedule a discussion of these procedures in collegial review (*Id.*). And, on August 12, 2015, Dr. Trost prescribed Neurontin 600 milligrams for Bilik (*Id.*).

The following day, August 13, 2015, Dr. Trost and Defendant Dr. Stephen Ritz discussed possible treatments for Bilik's lower back pain, including alternative treatments and testing (*Id.*). They concluded that his examinations and x-rays were normal; therefore, there was no need for an MRI or physical therapy. Instead, they decided to continue monitoring Bilik and treating his symptoms (*Id.*).

Dr. Trost attested that he did not initially prescribe Neurontin for Bilik because it is a non-formulary drug, it has the potential to be abused by individuals looking to get high, and it holds trade value in a correctional setting (*Id.*). Before prescribing Neurontin, Dr. Trost prescribes alternatives such as Mobic and Nortriptyline (*Id.*). He further attested that he did not order physical therapy or an assistive device for Bilik such as crutches or a wheelchair because they were not necessary (*Id.*).

On August 28, 2015, Bilik had a cervical spine x-ray, which was compared with a cervical spine x-ray taken on December 12, 2012 (Doc. 110-5 at p. 37). The August 28, 2015 x-ray showed normal soft tissues, no loss of cervical vertebral body height, straightening of the cervical spine, no misalignment, and preserved disc spaces (*Id.*).

On September 24, 2015, Bilik saw Defendant Sharon McGlorn, a nurse practitioner at Menard, for complaints of jaw popping and blood coming from the right ear, as well as Mobic upsetting his stomach (Doc. 110-10). McGlorn assessed Bilik as having seasonal allergies and discontinued the Mobic (*Id.*). She also added Claritin for seasonal allergies symptoms and told him to follow up with dental (*Id.*).

McGlorn saw Bilik again on January 13, 2016, when he requested a low gallery permit (*Id.*). McGlorn attested that Bilik did not qualify for a permit based on IDOC

guidelines (*Id.*). She further attested that Bilik reported a history of chronic pain and nerve damage, insisted he was being denied appropriate care, and stated that he believed he should have had an MRI (*Id.*). McGlorn attempted to explain the results of the x-ray performed on January 5, 2016, to no avail (*Id.*). Bilik also complained that he was supposed to have an ultrasound on a sebaceous cyst on his head (*Id.*). McGlorn referred Bilik to Dr. Trost for further evaluation and treatment regarding the MRI and ultrasound.

Bilik filed a number of grievances related to his health care, prescription medications, and disability accommodations while housed at Menard (Doc. 131-1). These grievances were reviewed by employees of the IDOC, including Defendants Gail Walls, Billie Greer, Angela Crain, Angela Grott, Richard Harrington, Kimberly Butler, Jacqueline Lashbrook, Richard Ferrell, and Cindy McDaniels ("IDOC Defendants") (*Id.*).

On February 2, 2016, Bilik was transferred from Menard Correctional Center to Pinckneyville Correctional Center.

Bilik filed this lawsuit under 42 U.S.C. § 1983 on July 20, 2016, alleging Defendants violated his constitutional rights (Doc. 1). After the Court's threshold review of the First Amended Complaint (Doc. 12) pursuant to 28 U.S.C. § 1915A, Bilik is proceeding on the following claims:

**Count 1:** Defendants denied Plaintiff medical care for his migraines at Menard from 2013-2016, in violation of his federal constitutional rights under the Eighth and Fourteenth Amendments and state constitutional rights under Art. I, §§ 1, 2, 4, 5, 11, 12, 19, and 24.

**Count 2:** Defendants denied Plaintiff medical care for his chronic nerve damage and back pain at Menard from 2013-2016, in violation of his federal constitutional rights under the Eighth and Fourteenth

Amendments and state constitutional rights under Art. I, §§ 1, 2, 4, 5, 6, 11, 12, 19, and 24.

**Count 5:** Defendants denied Plaintiff access to his prescription medications for both conditions at Menard from 2013-2016, in violation of his federal constitutional rights under the Eighth and Fourteenth Amendments.

**Count 7:** IDOC Directors Salvador Godinez and John Baldwin, in their official capacities, violated Plaintiff's rights under the ADA and Rehabilitation Act by failing to treat his chronic medical conditions and refusing him physical therapy, which rendered him unable to participate in daily activities.

All Defendants moved for summary judgment on the merits of Bilik's claims (Docs. 106, 109, 129).

## THE REPORT AND RECOMMENDATION AND OBJECTIONS

On August 30, 2019, Judge Sison entered the Report and Recommendation currently before the Court (Doc. 190). Judge Sison recommends the undersigned grant summary judgment to Defendants on Bilik's deliberate indifference claims, Counts 1, 2, and 5, because there is no evidence that any Defendant substantially departed from accepted professional judgment, practice, or standards such that their conduct gives rise to the inference that they intentionally or recklessly disregarded Bilik's needs.

With regard to the medical Defendants, Judge Sison noted that Bilik received thorough medical treatment for his ailments, albeit not the medications he wanted. Judge Sison further found that Bilik's complaints and demands for medication and treatment were often unsupported by the physical examinations, x-rays, and records.

With regard to the IDOC Defendants, Judge Sison found that they were either administrative staff or correctional officers who were not personally involved in Bilik's

medical treatment, they reviewed grievances filed only days after Bilik saw the treating doctors and/or when he was scheduled to see the doctor in the near future, and they were entitled to rely on the findings and treatment plans of the medical professionals.

As to Bilik's claim that Defendants Godinez and Baldwin violated his rights under the ADA and RA, Judge Sison found that the record shows Defendants provided Bilik with a low gallery permit. Bilik further was allowed to have a low bunk and was not required to work for a year. Moreover, Bilik testified that no matter what accommodations were available, he would not have been able to participate in anything because of his disability. Judge Sison concluded that there simply was no evidence that Bilik was discriminated against because of his alleged disability. Accordingly, he recommends the undersigned grant summary judgment to Godinez and Baldwin.

After an extension of time, Bilik filed an objection to the Report and Recommendation on October 30, 2019 (Doc. 198). With regard to his prescription medications, Bilik argues that the medications provided by Defendants were ineffective for at least two full years, causing him to needlessly suffer severe pain. Bilik also argues that Defendants failed to follow his specialists' orders regarding appropriate medication, as well his prescribed physical therapy, thereby exacerbating and prolonging his pain and suffering. Furthermore, the lack of physical therapy caused him to suffer severe muscle tightness, tenderness, and pain.

Ultimately, Bilik contends that he put Defendants on notice he was not receiving adequate, effective treatment, and Defendants had the responsibility to care for him and to get him outside treatment, which they failed to do. He further argues that although

non-medical personnel generally are justified in relying on the judgment of medical professionals, an exception to this rule lies where non-medical officials have reason to believe that prison doctors are mistreating or not treating a prisoner. Here, Bilik asserts, he notified the IDOC Defendants by grievances and by speaking to them directly that he was not receiving his prescribed medications or any physical therapy.

In response, Defendants McGlorn, Trost, Fuentes, Ritz, and Moldenhauer argue Judge Sison properly found that Bilik was seen countless times for his ailments and received thorough treatment, albeit not the specific treatment he wanted (Doc. 199). Dr. Shearing argues that the evidence shows he ceased Bilik's medications because he thought they were actually *causing* his rebound headaches (Doc. 200). In that instance, cessation of the offending medication is the proper remedy. And while Dr. Trost did put Bilik back on Neurontin in August 2015, two years after Dr. Shearing left Menard, that was simply a matter of a physician's discretion in choosing particular course of treatment. The IDOC Defendants did not file a response to Bilik's objection.

## Legal Standards

When timely objections are filed, the Court must undertake *de novo* review of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b); SDIL-LR 73.1(b); *Harper v. City of Chicago Heights*, 824 F. Supp. 786, 788 (N.D. Ill. 1993); *see also Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992). This requires the Court to look at all evidence contained in the record, give fresh consideration to those issues specifically objected to, and make a decision "based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Harper*,

824 F.Supp. at 788 (citing 12 Charles Alan Wright et al., Federal Practice and Procedure § 3076.8, at p. 55 (1st ed. 1973) (1992 Pocket Part)); *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). The Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Summary judgment is proper only if the moving party can demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). But "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## A.    Deliberate Indifference

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

To establish deliberate indifference, a plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. Whether a prison official acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).

In cases where a prisoner alleges not that his condition was ignored entirely, but

that he received constitutionally deficient treatment for the condition, the Seventh Circuit has framed the issue "not [as] deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (internal quotation marks omitted)). In those cases, a court should defer to a medical professional's treatment decision "unless no minimally competent professional would have so responded under those circumstances." *Id.*; *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

"Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted). A health care provider acting in his professional capacity "may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

While a medical professional's persistence in a course of treatment known to be ineffective or choice to pursue an easier and less efficacious treatment may support a claim of deliberate indifference, the Seventh Circuit has "routinely rejected claims . . . where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment." *Lockett*, 937 F.3d at 1023-24. Specifically, with respect to pain control, the Seventh Circuit

has repeatedly found the issue to require the application of "medical expertise and judgment." *Id.* at 1024 (quoting *Snipes*, 95 F.3d at 591).

For example, in *Burton v. Downey*, prison staff members were found not to be deliberately indifferent for prescribing non-narcotic medication after the plaintiff's surgery—even though a primary physician outside of prison previously prescribed a narcotic. *Burton v. Downey*, 805 F.3d 776, 785–86 (7th Cir. 2015). The Court noted that the decision to prescribe non-narcotic pain medication because it had "less addictive potential" than the narcotic medication was within the bounds of professional judgment. *Id.* at 785. And the fact that the outside physician had prescribed another medication merely demonstrated "that another doctor would have followed a different course of treatment," which is insufficient to establish deliberate indifference. *Id.* at 786. The Court also noted that the plaintiff failed to present any objective evidence that his painful withdrawal symptoms created a serious medical need for a narcotic. *Id.*

Likewise, in *Lockett*, a nurse practitioner discontinued the prisoner's prescription for oxycodone after he experienced a sickle cell crisis and returned him to his prior prescription for Tylenol #3. *Lockett*, 937 F.3d at 1024. The Court found that the nurse's "deliberate decision" based on her professional assessment to treat the prisoner using Tylenol #3 rather than oxycodone could not support an Eighth Amendment violation. *Id.* Rather, the record indicated that the nurse exercised her medical judgment to make her treatment decision. And, "far from being indifferent to his pain," the nurse had increased the strength of the inmate's pain medication while also considering his own history of substance abuse and the risks associated with opioid use and substance abuse in prison.

*Id.* at 1025. The totality of the defendant's care, the Court found, affirmatively showed that she was "continually solicitous of" and "responsive to" the inmate's needs. *Id.* (quoting *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 592 (7th Cir. 1999)). Therefore, the Court found, no reasonable jury could have found in favor of the plaintiff on his deliberate indifference claim. *Id.*

The same can be said here. The record indicates Bilik was seen by a healthcare professional *at least* 27 times during his stay at Menard for his migraine, nerve, and back pain. Nearly every time, his prescription medication changed or the dosage was modified in an effort to regulate his pain. Nurses referred Bilik to the doctors; the doctors performed exams and ordered medications. X-rays were taken; strengthening exercises and pain control techniques were recommended. The fact that the doctors chose not to treat Bilik with addictive opioids and other medications known to be abused in the prison setting does not make them deliberately indifferent.

Neither does the fact that Bilik previously was prescribed these strong medications or that he was given them again after he left Menard. That merely shows "that another doctor would have followed a different course of treatment," which is insufficient to establish deliberate indifference. *Burton*, 805 F.3d at 785–86; *see also Franklin v. Bowens*, 777 F. App'x 168, 169 (7th Cir. 2019) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (there is no constitutional requirement that a prison doctor keep an inmate "pain-free").

Indeed, Dr. Shearing explained that he purposefully took Bilik off of these medications because long-term overuse of them could have been causing Bilik to suffer increasingly severe rebound headaches. Dr. Trost attested that drugs like Neurontin have

the potential to be abused by people looking to get high and hold trade value in prison, which is why he tries other medications first. And Dr. Fuentes testified that Bilik's physical exam did not warrant prescribing Neurontin. Each of these doctors exercised his or her professional judgment in making treatment decisions. Considering the totality of Bilik's care and the well-documented risks associated with opioid use,[2] the Court finds that Defendants were "far from being indifferent to his pain." *See Lockett*, 937 F.3d at 1025.

With regard to the lack of physical therapy or Defendants' failure to send Bilik to an outside specialist, the Court notes that his diagnostic x-rays and physical tests revealed normal results. Thus, there was no need for Bilik to be sent to a specialist. *See Franklin*, 777 F. App'x at 169. Furthermore, the evidence shows that Dr. Fuentes, Dr. Trost, Dr. Ritz, and Nurse Moldenhauer all concluded that physical therapy was not clinically indicated or medically necessary based on Bilik's examination results. Bilik even testified that it was possible he was given instructions or guidance from a health care professional about stretches or exercises he could do in his cell to improve his condition, but that he did not do any (Doc. 110-1 at p. 34). Thus, the Court finds Defendants were not deliberately indifferent for failing to send Bilik to physical therapy.

The Court further agrees with Judge Sison that the IDOC Defendants could not have been deliberately indifferent to Bilik's serious medical conditions. Not only are they entitled to rely on the judgment of medical professionals and had no personal involvement in Bilik's medical care, but Bilik's grievances were filed only days after he

---

[2] Truth be told, Bilik would be hard-pressed to find a doctor *anywhere* willing to prescribe him opioid medication in the year 2020, especially to manage chronic pain on a daily basis.

saw his treating doctors or when he was scheduled to see the doctor again in the near future. They investigated Bilik's medical issues and timely responded to Bilik with accompanying memoranda. Thus, the Court finds the IDOC Defendants were not deliberately indifferent. *See Franklin*, 777 F. App'x at 169.

**B.      Americans with Disabilities Act and Rehabilitation Act**

Remaining is Bilik's claim against IDOC Directors Salvador Godinez and John Baldwin for violating his rights under the ADA and Rehabilitation Act by failing to treat his chronic medical conditions and refusing him physical therapy, which rendered him unable to participate in daily activities. Bilik objects to the Report and Recommendation because he claims Baldwin and Godinez should have ensured his health and well-being while incarcerated. He also claims they were put on notice of the deficient medical system by way of the "Lippert Report," a document from a separate class action lawsuit. Specific to the facts of this case, Bilik states that he would rarely make chow and that someone would have to carry his bags back from commissary for him. He also was unable to attend yard or gym, and he could not make his bed or clean his cell.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act prohibits any agency that receives federal funds from excluding, subjecting to discrimination, or denying the benefits of any of their programs to otherwise qualified individuals with disabilities. 29 U.S.C. § 794(a). Failure to make reasonable

accommodations to ensure participation in the public entity's programs or services by a person with a disability qualifies as "discrimination." 42 U.S.C. § 12112(b)(5)(A).

"In the prison context, a plaintiff can make out a prima facie case of discrimination under both the ADA and the Rehabilitation Act by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)).

Evaluating the reasonableness of a particular accommodation in the prison context is particularly fact-intensive and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. *Golden v. Illinois Dep't of Corr.*, No. 12-CV-7743, 2016 WL 5373056, at *4 (N.D. Ill. Sept. 26, 2016) (citing *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015)). "Security concerns, safety concerns, and administrative exigencies [are] important considerations to take into account." *Id.* (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)). The key question is whether the inmate was able to participate in the activities in question, given his disability, with or without reasonable accommodations from the prison. *Love*, 103 F.3d at 560.

Here, Bilik testified that Defendants failed to make reasonable accommodations when they failed to prescribe him the proper pain medication and send him to an outside specialist (Doc. 131 at p. 21). But the ADA is not violated "by a prison's simply failing to

attend to the medical needs of its disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). A claim for inadequate medical treatment is not actionable under the ADA. *Id.*; *Johnson v. Redmond*, No. 17 C 50210, 2017 WL 6813706, at *2 (N.D. Ill. Oct. 30, 2017); *see also Wilson v. Murphy*, No. 14-CV-222-BBC, 2016 WL 1248993, at *6 (W.D. Wis. Mar. 29, 2016) (medical treatment decisions are outside the scope of the ADA and RA).

Bilik does not allege that he was discriminated against, nor does he claim that he did not receive the medication or outside referrals *because* of his disability. *See id.* He is simply arguing that Defendants violated the ADA and RA by not giving him effective painkillers or sending him to a specialist or physical therapy. Because Defendants' decisions regarding Bilik's medical care do not implicate the ADA or RA, the Court finds Judge Sison properly recommended summary judgment be granted in their favor.

## CONCLUSION

For these reasons, the Court **ADOPTS** the Report and Recommendation of Magistrate Judge Gilbert C. Sison (Doc. 190), **OVERRULES** the objection filed by Plaintiff Richard Bilik (Doc. 198), and **GRANTS** the motions for summary judgment filed by Defendants (Docs. 106, 109, 129). Bilik's motions to evaluate documents/declaration (Docs. 169, 171) are **DENIED as moot**. Plaintiff Richard Bilik shall recover nothing, and the Clerk of Court is directed to enter judgment and close this case.

**IT IS SO ORDERED.**

**DATED:   January 7, 2020**

_Nancy J. Rosenstengel_

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**